Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail:   bheikali@faruqilaw.com

[Additional Captions on Signature Page]

*Attorney for Plaintiff Brian Carter*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CARTER, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>AQUANTIA CORP., FARAJ AALAEI, LIP-BU TAN, SAM S. SRINIVASAN, KENNETH R. PELOWSKI, GEOFFREY G. RIBAR, DR. BAMDAD BASTANI, DMITRY S. AKHANOV, MAXIMILIANE C. STRAUB, and ANDERS SWAHN, )<br><br>Defendants. ) | Case No.  3:19-cv-3092<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    Plaintiff Brian Carter ("Plaintiff"), by his undersigned attorneys, alleges upon personal

2  knowledge with respect to himself, and information and belief based upon, *inter alia*, the

3  investigation of counsel as to all other allegations herein, as follows:

4                              **NATURE OF THE ACTION**

5    1.    This action is brought as a class action by Plaintiff on behalf of himself and the

6  other public holders of the common stock of Aquantia Corp. ("Aquantia" or the "Company")

7  against the Company and the members of the Company's board of directors (collectively, the

8  "Board" or "Individual Defendants," and, together with Aquantia, the "Defendants") for their

9  violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

10  Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17

11  C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between

12  Aquantia and Marvell Technology Group Ltd. ("Marvell").

13    2.    On May 6, 2019, the Board caused the Company to enter into an agreement and

14  plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to

15  receive $13.25 in cash for each share of Aquantia stock they own (the "Merger Consideration").

16    3.    On May 29, 2019, in order to convince Aquantia shareholders to vote in favor of

17  the Proposed Transaction, the Board authorized the filing of a materially incomplete and

18  misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and

19  Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

20  The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100)

21  and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a)

22  and 20(a) of the Exchange Act.

23    4.    While touting the fairness of the Merger Consideration to the Company's

24  shareholders in the Proxy, Defendants have failed to disclose certain material information that is

25  necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby

26  violating SEC rules and regulations and rendering certain statements in the Proxy materially

27

28
- 1 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1   incomplete and misleading.

2       5.      In particular, the Proxy contains materially incomplete and misleading information

3   concerning: (i) the financial projections for the Company that were prepared by the Company and

4   relied on by Defendants in recommending that Aquantia shareholders vote in favor of the Proposed

5   Transaction; and (ii) the summary of certain valuation analyses conducted by Aquantia's financial

6   advisor, Barclays Capital Inc. ("Barclays"), in support of its opinion that the Merger Consideration

7   is fair to shareholders, on which the Board relied.

8       6.      It is imperative that the material information that has been omitted from the Proxy

9   is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an

10  informed decision regarding the Proposed Transaction.

11      7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

12  Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants'

13  violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9).

14  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction

15  and taking any steps to consummate the Proposed Transaction unless, and until, the material

16  information discussed below is disclosed to Aquantia shareholders sufficiently in advance of the

17  vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to

18  recover damages resulting from the Defendants' violations of the Exchange Act.

19                          **JURISDICTION AND VENUE**

20      8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

21  Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

22  violations of Section 14(a) and 20(a) of the Exchange Act.

23      9.      Personal jurisdiction exists over each Defendant either because the Defendant

24  conducts business in or maintains operations in this District, or is an individual who is either

25  present in this District for jurisdictional purposes or has sufficient minimum contacts with this

26  District as to render the exercise of jurisdiction over Defendant by this Court permissible under

27

28
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

1    traditional notions of fair play and substantial justice.

2        10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

3    78aa, as well as under 28 U.S.C. § 1391, because Aquantia maintains its principal executive offices

4    in this District.

5                                         **PARTIES**

6        11.    Plaintiff is, and at all relevant times has been, a holder of Aquantia common stock.

7        12.    Defendant Aquantia is incorporated in Delaware and maintains its principal

8    executive offices at 91 E. Tasman Drive, Suite 100, San Jose, California 95134. The Company's

9    common stock trades on the NYSE under the ticker symbol "AQ."

10       13.    Individual Defendant Faraj Aalaei is Aquantia's President, Chief Executive Officer

11   and Chairman and has been a director of Aquantia at all relevant times.

12       14.    Individual Defendant Lip-Bu Tan is Aquantia's lead director and has been a

13   director of Aquantia at all relevant times.

14       15.    Individual Defendant Sam S. Srinivasan has been a director of Aquantia at all

15   relevant times.

16       16.    Individual Defendant Kenneth R. Pelowski has been a director of Aquantia since

17   July 2013.

18       17.    Individual Defendant Geoffrey G. Ribar has been a director of Aquantia since

19   September 2017.

20       18.    Individual Defendant Dr. Bamdad Bastani has been a director of Aquantia since

21   June 2016.

22       19.    Individual Defendant Dmitry S. Akhanov has been a director of Aquantia since

23   April 2013.

24       20.    Individual Defendant Maximiliane C. Straub has been a director of Aquantia at all

25   relevant times.

26       21.    Individual Defendant Anders Swahn has been a director of Aquantia since June

27

28
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    2018.

2        22.    The Individual Defendants referred to in paragraphs 13-21 are collectively referred

3    to herein as the "Individual Defendants" and/or the "Board."

4                            **CLASS ACTION ALLEGATIONS**

5        23.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself

6    and the other public shareholders of Aquantia (the "Class").   Excluded from the Class are

7    Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated

8    with any Defendant.

9        24.    This action is properly maintainable as a class action because:

10            a.    The Class is so numerous that joinder of all members is impracticable.  As

11    of May 3, 2019, there were approximately 35,000,000 shares of Aquantia common stock

12    outstanding, held by hundreds of individuals and entities scattered throughout the country.

13    The actual number of public shareholders of Aquantia will be ascertained through

14    discovery;

15            b.    There are questions of law and fact that are common to the Class that

16    predominate over any questions affecting only individual members, including the

17    following:

18                    i)    whether Defendants disclosed material information that includes

19                        non-GAAP financial measures without providing a reconciliation of

20                        the same non-GAAP financial measures to their most directly

21                        comparable GAAP equivalent in violation of Section 14(a) of the

22                        Exchange Act;

23                    ii)    whether Defendants have misrepresented or omitted material

24                        information concerning the Proposed Transaction in the Proxy in

25                        violation of Section 14(a) of the Exchange Act;

26

27

28
                                    - 4 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>SUBSTANTIVE ALLEGATIONS</u>

**I.    The Proposed Transaction**

25.    Aquantia designs, develops and markets advanced high-speed communications integrated circuits for Ethernet connectivity in the data center, enterprise infrastructure, access and automotive markets. The Company's Ethernet products provide an interface between the high-

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

speed analog signals transported over wired infrastructure and the digital information used in computing and networking equipment.

26.     On May 6, 2019, Aquantia and Marvell issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> SANTA CLARA, Calif. and SAN JOSE, Calif., May 6, 2019 /PRNewswire/ -- Marvell Technology Group Ltd. (NASDAQ: MRVL), a leader in infrastructure semiconductor solutions, and Aquantia, Corp. (NYSE: AQ), a leader in Multi-Gig Ethernet connectivity, today announced a definitive agreement, approved by the boards of directors of both companies, under which Marvell will acquire all outstanding shares of Aquantia common stock in exchange for consideration of $13.25 per share in cash.
>
> The acquisition of Aquantia complements Marvell's portfolio of copper and optical physical layer product offerings and extends its position in the Multi-Gig 2.5G/5G/10G Ethernet segments. In particular, Aquantia's innovative Multi-gig automotive PHYs, coupled with Marvell's industry-leading gigabit PHY and secure switch products, creates the broadest and most advanced range of high-speed in-car networking solutions in the world.  This unique combination accelerates Marvell's vision for the future of automotive networking with speeds necessary to enable level 4 and 5 autonomous driving.
>
> As the automotive industry increasingly adopts Ethernet in-vehicle networks for mainstream models, the number of related ports is expected to grow dramatically at a 62% annualized growth trajectory, from 53 million in 2018 to 367 million by 2022[1].
>
> "Our acquisition of Aquantia will fuel Marvell's leadership in the transformation of the in-car network to high-speed Ethernet over the next decade," said Matt Murphy, president and CEO of Marvell.  "At the same time, Aquantia extends our reach in the rapidly emerging Multi-Gig segment of network infrastructure and creates a leading end-to-end Ethernet connectivity portfolio."
>
> "Marvell and Aquantia share a vision where the network – whether in an autonomous vehicle, an enterprise application or in cloud infrastructure – can seamlessly power the data economy," said Faraj Aalaei, chairman and CEO of Aquantia. "This is a fantastic opportunity as our customers will benefit from Marvell's global scale and expanding footprint in Multi-Gig network applications." The transaction is expected to be immediately accretive to Marvell's non-GAAP earnings per share and generate significant annual run-rate synergies of $40 million to be realized within 12 months after the transaction closes.
>
> [1]Source: Strategy Analytics

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Transaction Structure and Terms**

Under the terms of the definitive agreement, Marvell will pay Aquantia's stockholders $13.25 per share in cash. This represents approximately $452 million in transaction value after adjusting for net cash on Aquantia's balance sheet. Marvell intends to finance the transaction with cash on hand and revolver borrowings. The transaction is not subject to any financing condition and is expected to close by the end of CY2019, subject to regulatory approval as well as other customary closing conditions, including the adoption by Aquantia's stockholders of the merger agreement.

In connection with the execution of the definitive agreement, certain stockholders of Aquantia, together holding approximately 17 percent of the outstanding shares of common stock of Aquantia, have agreed to vote their shares in favor of the transaction under a voting and support agreement.

**Marvell Preliminary First Fiscal Quarter 2020 Results**

Based on preliminary financial information, Marvell expects its first quarter revenue to be in the range of $650 million +/- 3%, the same range as guided on March 7, 2019. Further information regarding first fiscal quarter results will be released on May 30 at 1:45 p.m. Pacific Time. This update is an estimate, based on information available to management as of the date of this release, and may be subject to further changes upon completion of Marvell's standard quarter closing procedures. This update does not present all necessary information for an understanding of Marvell's financial condition as of May 4, 2019, or its results of operations for the quarter ended May 4, 2019.

**Call/Webcast to Discuss Transaction**

Interested parties may join a conference call Monday, May 6, 2019 at 6:00 a.m. Pacific Time to discuss the transaction by dialing 1 (844) 647-5488 in the U.S. or +1 (615) 247-0258 internationally, with the conference ID 7355589. A webcast of the call can be accessed by visiting Marvell's investor relations website. A replay will be available until Monday, May 13, 2019 by dialing 1 (855) 859-2056, replay ID 7355589.

**Additional Information and Where to Find It**

Aquantia intends to file with the Securities and Exchange Commission (the "SEC") a proxy statement in connection with the proposed transaction with Marvell. The definitive proxy statement will be distributed to the stockholders of Aquantia and will contain important information about the proposed transaction and related matters. SECURITY HOLDERS ARE URGED TO READ THE PROXY STATEMENT CAREFULLY WHEN IT BECOMES AVAILABLE. The proxy statement and other relevant materials (when they become available), and any other

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-3092

documents filed by Aquantia with the SEC, may be obtained free of charge at the SEC's website, at www.sec.gov.  In addition, security holders will be able to obtain free copies of the proxy statement from Aquantia by contacting Investor Relations by mail at Aquantia Corp., 91 E. Tasman Dr. Suite 100, San Jose, CA 95134, Attn: Investor Relations Department, or by telephone at (650) 815-1239.

**Participants in the Solicitation**

Aquantia and Marvell and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Aquantia stockholders in connection with the proposed transaction. Information about Aquantia's directors and executive officers in the proposed transaction will be included in the proxy statement described above. Information about Marvell's directors and executive officers is set forth in Marvell's proxy statement for its 2018 Annual Meeting of Shareholders filed with the SEC on May 28, 2018, Item 5.02 of its Current Report on Form 8-K filed on July 6, 2018 and its Annual Report on Form 10-K for the year ended February 2, 2019, filed on March 28, 2019.  These documents are available free of charge at the SEC's web site at www.sec.gov and by going to Aquantia's Investor Relations page on its corporate web site at www.Aquantia.com or by going to Marvell's Investor Relations page on its corporate web site at www.marvell.com.

**About Marvell**

Marvell first revolutionized the digital storage industry by moving information at speeds never thought possible.  Today, that same breakthrough innovation remains at the heart of the company's storage, processing, networking, security and connectivity solutions.  With leading intellectual property and deep system-level knowledge, Marvell's semiconductor solutions continue to transform the enterprise, cloud, automotive, industrial and consumer markets.  To learn more, visit: https://www.marvell.com.

Marvell and the M logo are registered trademarks of Marvell and/or its affiliates in the US and/or elsewhere. Other names and brands may be claimed as the property of others.

**About Aquantia**

Aquantia is a leader in the design, development and marketing of advanced, high-speed communications ICs for Ethernet connectivity in the Data Center, Enterprise Infrastructure, Access and Automotive markets.  Aquantia's products are designed to cost-effectively deliver leading-edge data speeds for use in the latest generation of communications infrastructure to alleviate network bandwidth bottlenecks caused by the growth of global IP traffic.  Aquantia is located in Silicon Valley. To learn more, visit: www.Aquantia.com.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

27.     Aquantia is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

29.     On May 29, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materially Misleading Sales Process*

30.     Aquantia, and more specifically Mr. Aalaei, appears to have favored making a deal with Marvell and has used a flawed sales process to guarantee this result. The *Background of the Merger* section omits certain information and presents other information in a false and/or misleading light to create the appearance of a fair process. The omitted information must be

- 9 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    disclosed and the false and/or misleading information must be corrected in order to provide

2    shareholders with an accurate representation of the sales process.

3        31.    According to the *Background of the Merger*, Marvell began to express interest in a

4    potential business combination on January 29, 2019. Proxy 19. The Company was interested in

5    discussing a potential transaction and by March 27, 2019, expressed to Marvell that if the Company

6    were to enter into a business combination, the Company wanted to do so before May 6, 2019, the

7    date that Aquantia was scheduled to announce its quarterly earnings. *Id.* at 20. Prior to April 11,

8    2019, Aquantia and Marvell were operating off of a previously signed confidentiality agreement.

9    *Id.* at 19. On April 11, 2019, the Company entered into a new confidentiality agreement with

10   Marvell that did not contain a standstill provision. *Id.* at 21.

11       32.    Between April 11, 2019 and April 12, 2019, Barclays, at the direction of Aquantia,

12   contacted eight potential strategic acquirers and the Company's management contacted one

13   additional potential strategic acquirer. *Id.* Over the following ten days, Companies A and B entered

14   into confidentiality agreements that *contained* standstill agreements which are still in effect. *Id.* at

15   22. On April 19, 2019, Aquantia and Marvell amended their April 11, 2019 confidentiality

16   agreement to include a standstill provision. *Id.* at 23.

17       33.    The Proxy does not disclose why the Company signed a confidentiality agreement

18   with Marvell that did not contain a standstill provision when the Company made Companies A

19   and B sign confidentiality agreements *with* a standstill provision. The Proxy also fails to disclose

20   if Companies A and B were aware that Marvell's confidentiality agreement did not contain a

21   standstill provision. Additionally, the Proxy discloses that the confidentiality agreements are still

22   in effect but does not disclose if the confidentiality agreements contained a "don't ask don't waive"

23   clause which may have further restricted Company A's and B's ability to enter into negotiations

24   with Aquantia. All of this information needs to be disclosed in order for the Company's

25   shareholders to have enough information about the sales process to determine if the Merger

26   Consideration is truly a fair representation of the Company's value.

27

28
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

34.     The Proxy discloses that on April 9, 2019, Mr. Aalaei explained to the board that Marvell was not interested in raising its acquisition price but that he believed engaging in further diligence with Marvell would persuade the company that a higher price was warranted. *Id.* at 21. On April 15, 2019, Mr. Aalaei had a discussion with Marvell whereby Marvell made a higher offer. *Id.* at 22. When Marvell was explaining the proposal, the company explained it would like Mr. Aalaei to continue working after the proposed transaction. *Id.* Marvell outlined two proposals for Mr. Aalaei's continued employment. *Id.* Later that day, Mr. Aalaei informed the Board of the proposal but did not mention Marvell was interested in his continued employment. *Id.* Furthermore, on April 16, 2019, Marvell delivered a non-binding proposal to the Company which indicated that Marvell would seek to identify and retain certain employees but did not specify which employees Marvell was interested in retaining. *Id.*

35.     On April 24, 2019, the Board established a transaction committee comprised of Mr. Aalaei, Sam Srinivasan and Geoffrey G. Ribar. It is unclear what exactly the transaction committee was established to do, as there was only one disclosed meeting and all the transaction committee did was approve the termination fee. *Id.* at 25.

36.     On May 3, 2019, three days before the deadline to sign a transaction agreement and after both Companies A and B dropped out of the bidding process, Mr. Aalaei disclosed to the Board that Marvell had requested his continued employment after completion of the potential transaction. *Id.* at 26. After Mr. Aalaei disclosed Marvell's request, the Board authorized Mr. Aalaei to continue negotiating with Marvell. *Id.*

37.     The Proxy does not disclose why Mr. Aalaei, who had interests at odds with the Company's shareholders and who failed to immediately inform the Board about Marvell approaching him for his continued employment, was allowed to continue negotiating the potential transaction. Additionally, the Proxy fails to disclose what influence Mr. Aalaei had as a member of the transaction committee and what influence the transaction committee had in general. All of this information must be disclosed in order for the Company's shareholders to have enough

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1   information about the sales process to determine if Mr. Aalaei negotiated in the best interests of

2   the shareholders in light of his conflicts of interest and if the Merger Consideration is truly a fair

3   representation of the Company's value.

4           38.     On January 29, 2019, Marvell first indicated to the Company that it was interested

5   in discussing a possible strategic transaction. *Id.* at 19. On March 24, 2019, Marvell delivered its

6   first preliminary non-binding proposal to acquire all of Aquantia's outstanding common stock. *Id.*

7   at 20. On March 27, 2019, the Company told Marvell that, if the Company were to enter into a

8   business combination, the Company wanted to do so before May 6, 2019. *Id.* On April 10, 2019,

9   Marvell provided the Company with an initial diligence request list and a draft merger agreement.

10  *Id.* at 21. The Company had all of these interactions with Marvell before Barclays even contacted

11  other potential strategic partners. *Id.* On April 23, 2019, Marvell provided the Company with a

12  draft of a voting and support agreement which contained an irrevocable proxy and non-solicitation

13  provisions. *Id.* at 23. Stockholders who would be required to sign the voting and support agreement

14  include Mr. Aalaei, among others, who beneficially own 13.4% of the outstanding shares of the

15  Company's common stock. *Id.* at 4.

16          39.     Company B was acting fast make an offer. On April 16, 2019, Company B sent a

17  due diligence request list and updated it on April 17, 2019. *Id.* at 22. Following the due diligence,

18  Company B delivered a non-binding letter of interest to Aquantia on April 26, 2019 with a proposal

19  to acquire all outstanding shares for $14.00 per share. *Id.* at 24. On April 27, 2019, for the first

20  time, Aquantia told Company B the transaction agreement must be signed by May 6, 2019. *Id.* On

21  April 29, 2019, Company B decided it would not be able to make this deadline and withdrew from

22  the sale process. *Id.*

23          40.     The Proxy does not explain the significance of the date May 6, 2019, and why it

24  was important enough to undermine a better offer than what the Company ultimately accepted.

25  The Proxy also fails to explain why, given the Company's knowledge that it wanted to sign an

26  agreement by May 6, 2019, the Company waited so long to have Barclays contact potential

27

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

strategic partners and why the Company was negotiating a support and voting agreement that contained an irrevocable proxy and non-solicitation provisions before Company B withdrew from the process. Moreover, the Proxy fails to explain why, given the very short amount of time provided to Company B to complete the sales process, Company B wasn't informed of the hard May 6, 2019 cutoff while Marvell was constantly being reminded of how important certain aspects of the sales process and merger agreement were. *Id.* at 22.

41.     All of this information must be disclosed in order for the Company's shareholders to have enough information to determine if the sales process was actually fair, or if an unfair sales process took place with the appearance of fairness to mask the inevitable conclusion of an agreement between Aquantia and Marvell. The omission of the above information and the inclusion of false and/or misleading material information renders the *Background of the Merger* section materially misleading. A shareholder needs to know detailed information about the sales process to determine if the Merger Consideration is truly a fair representation of the Company's value. The omitted information and the included false and/or misleading information is information that would alter the total mix of information available to shareholders and any reasonable shareholder would find the information material.

### *The Materiality of Financial Projections*

42.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses one of the reasons the Board recommends the merger is "our Board of Directors' familiarity with, and understanding of, Aquantia's business, assets, financial condition, results of operations, current business strategy, prospects and the risks facing the semiconductor industry . . . ." *Id.* at 28.

43.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers

- 13 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

44.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

45.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

46.    Here, Aquantia's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its

- 14 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine "our Board of Directors' belief that the agreed [p]rice [p]er [s]hare represented the best proposal and economic value available to Aquantia stockholders, based upon an overall assessment, among other things, of the net present value of the risk-adjusted returns that are likely to accrue to stockholders over the long term[.]"  Proxy 27.

47.    As discussed further below, the non-GAAP financial projections here do not provide Aquantia's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

48.    The Proxy discloses that the financial projections were developed by the Company's management "on April 3, 2019 . . . [and] subsequently updated, on April 26, 2019," and were made available to the Board "in connection with its evaluation of the proposed Merger with [Marvell] and the [p]rice [p]er [s]hare." *Id.* at 40.

49.    The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 (the "Management Projections") for: (1) EBITDAS; (2) NOPAT; and (3) Unlevered Free Cash Flow but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures.  *Id.* at 42-43.

50.    The Proxy defines EBITDAS as "earnings before interest, tax, depreciation, amortization and stock-based compensation." *Id.* at 43 n.1.  Nevertheless, the Proxy fails reconcile EBITDAS to its most comparable GAAP measure or disclose the line items used to calculate EBITDAS, rendering the Proxy materially false and/or misleading.  *Id.*

51.    The Proxy defines NOPAT as "operating income less taxes." *Id.* at 43 n.2.  While operating income is a GAAP measure, the proxy states "[t]he Management Projections were not

- 15 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    prepared with a view toward public disclosure or toward complying with U.S. generally accepted

2    accounting principles ("GAAP"), nor were they prepared with a view toward compliance with the

3    published guidelines of the SEC, or the guidelines established by the American Institute of

4    Certified Public Accountants for preparation and presentation of projections of prospective

5    financial information." *Id.* at 41. Therefore, it isn't clear that the disclosed operating income is a

6    GAAP compliant operating income. Moreover, NOPAT does not appear to be a financial measure

7    the Company regularly uses as the Company's Form 10-K for the fiscal year December 31, 2018

8    is devoid of NOPAT. This is in contrast to a measure such as net income, which is clearly GAAP

9    compliant and is regularly reported by the Company. Thus, although the Proxy discloses NOPAT,

10   which is a possibly GAAP compliant term, the Proxy fails to clearly show whether or not it is.

11   This could have been easily established by placing a footnote on operating income to establish it

12   is GAAP operating income and therefore NOPAT would be clearly a GAAP measure. Therefore,

13   the Proxy's failure to make clear whether or not NOPAT is a GAAP compliant term is misleading

14   and, in the event NOPAT is a non-GAAP financial, the Proxy fails to reconcile NOPAT to its most

15   comparable GAAP measure, rendering the Proxy materially false and/or misleading. *Id.*

16        52.    The Proxy defines Unlevered Free Cash Flow ("UFCF") as "as net operating

17   income (i) less taxes, capital expenditures and changes in net working capital; and (ii) plus

18   depreciation." *Id.* at 43 n.3. Nevertheless, the Proxy fails to reconcile UFCF to its most comparable

19   GAAP measure, rendering the Proxy materially false and/or misleading. *Id.*

20        53.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an

21   incomplete and materially misleading understanding of the Company's future financial prospects

22   and the inputs and assumptions which those prospects are based upon.  It is clear that those inputs

23   and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures

24   disclosed and relied on by the Board to recommend the Proposed Transaction in violation of

25   Section 14(a) of the Exchange Act.

26

27

28
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

54.     The financial projections disclosed on pages 42-43 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G, as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

55.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

56.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

57.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

- 17 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-3092

. . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

58.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5] Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Aquantia included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

59.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP

---

[4]     SEC, *Final Rule*.

[5]     *See, e.g*., Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

financials relating to a business combination),[7] with *Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

60.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

***The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9***

61.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial

---

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/ filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/ filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/ filename1.htm. *See also Actel Corp.*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1. pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www. sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions which reflects the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which, through the use of Q&As, reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-3092

forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

62.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that Non-GAAP financial measures "should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Aquantia may not be comparable to similarly titled amounts used by other companies." Proxy 42.

63.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

64.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 42-43, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

65.     The summary of the valuation methodologies utilized by Barclays, including the utilization of certain of the non-GAAP financial projections described above, in connection with its valuation analyses, (*id.* at 32) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

66.     With respect to Barclays' *Selected Comparable Company Analysis*, Barclays calculated seven companies' enterprise value and compared that to its 2019 estimated revenue ("EV/CY 2019E Revenue"), 2020 estimated revenue ("EV/CY 2020E Revenue") and 2020

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1   estimated EBITDAS ("EV/CY 2020E EBITDAS"). *Id.* at 34. Throughout the analysis, Macom
2   Technology Solutions Holdings, Inc. falls below the mean and the median for every metric. It
3   appears that Barclays has included an outlier, Macom, in its analysis.

4          67.    After normalizing the data presented in the *Selected Comparable Company*
5   *Analysis* and calculating Macom's z value for each of the three metrics, it is clear that given the
6   sample size, Macam is an outlier in all categories. Macom has a calculated Z value of -1.966, -
7   1.976, and -1.364 for EV/CY 2019E Revenue, EV/CY 2020E Revenue and EV/CY 2020E
8   EBITDAS, respectively. Macom's z values for EV/CY 2019E Revenue and EV/CY 2020E
9   Revenue are statistically significant at a 95% confidence level and Macom's EV/CY 2020E
10  EBITDAS z value is statistically significant at a 90% confidence level. Therefore, there is a greater
11  than 95% chance that Macom's EV/CY 2019E Revenue and EV/CY 2020E Revenue ratios are
12  outliers and an approximately 91.5% chance that Macom's EV/CY 2020E Revenue is an outlier.

13         68.    Barclays deemed Macom a comparable company to Aquantia, but the Proxy does
14  not disclose how much weight Barclays gave Macom's financials. It appears that at least some
15  value was given to Macom's financials as the multiple range Barclays selected for the Company's
16  EV/CY 2020E Revenue, 3.75x-4.5x, is below the mean and the median of 4.781x and 5.3x,
17  respectively. *Id.* at 35. Additionally, Barclays' selected EV/CY 2019 Revenue multiple range of
18  4.5x-5.5x just barely meets the mean of 5.453x and is below the median of 5.92. *Id.*

19         69.    Shareholders need to know if Macom was a factor in the selection of the multiple
20  range and, if Macom was considered, how much weight was given to its financials. Shareholders
21  need to know because the implied value per share based on EV/CY 2019E Revenue of $12.86-
22  $15.32 only barely contains the $13.25 per share Merger Consideration and the EV/CY 2020E
23  Revenue implied value per share range of $16.46-$19.39 is far above the Merger Consideration.
24  *Id.* Shareholders need to know if these ranges were artificially depressed from reliance on an
25  obvious outlier. Without this information, shareholders are being misled to believe that their shares
26  are worth less than they actually are and it makes the Merger Consideration look more attractive

27

28
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

1    than it really is. Therefore, shareholders need this information to determine if the Merger

2    Consideration adequately compensates them for the true value of their shares.

3        70.    With respect to Barclays *Selected Comparable Company Discounted Equity Value*

4    *Analysis*, Barclays used the same seven companies and calculated their 2020 earnings per share

5    ratios as adjusted for non-recurring items, amortization of intangibles and stock-based

6    compensation. *Id.* at 35. The Proxy does not disclose any of the calculated earnings per share

7    values for any of the seven selected companies. Since Barclays has used a non-GAAP earnings

8    per share calculation, the proxy must disclose at least the calculated values for the individual

9    companies for shareholders. Without this information, Barclay's selected multiple range of 15x-

10   20x means nothing as there is nothing to compare it against. This defeats the purpose of a

11   *comparable* analysis.

12       71.    Additionally, Barclays has calculated implied value per share for the price to

13   calendar year 2022 earnings per share of $12.63-$16.84, which just barely contains the Merger

14   Consideration, and the price to calendar year 2023 earnings per share implied equity value range

15   of $17.12-$22.83 is substantially higher than the Merger Consideration of $13.25 per share.

16   Without the individual multiples for each of the seven comparable companies, shareholders will

17   be unable to compare Barclays' calculations to the other companies. Without this information,

18   shareholders are being misled to believe that their shares are worth less than they actually are and

19   it makes the Merger Consideration look more attractive than it really is. Therefore, shareholders

20   need this information to determine if the Merger Consideration adequately compensates them for

21   the true value of their shares.

22       72.    With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy states that

23   Barclays used the Management Projections to perform the discounted cash flow analysis on

24   Aquantia. *Id.* at 37. It is unclear if Barclays used management's forecasted UFCF or if the UFCF

25   presented is what Barclays has calculated. However, Barclays states it used forecasted UFCF for

26   the nine-month period from April 1, 2019 to December 31, 2019 and for the full years from January

27

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1, 2020 through December 31, 2023 based on the updated Management Projections. *Id.* Barclays calculated the terminal value based at the end of calendar year 2023 by selecting a range of estimated next twelve months adjusted EBITDAS exit multiples of 9x to 11x. *Id.* Barclays used a discount rate of 14.5% to 16% based on the Company's weighted average cost of capital and the comparable companies from the *Selected Comparable Company Analysis*. *Id.* Barclays did not treat stock-based compensation as a cash expense. *Id.*

73.    The Company does not provide the information Barclays utilized in the *Illustrative Discounted Cash Flow Analysis*. The Company did not disclose the values Barclays calculated for the range of terminal values or any of the inputs that went into calculating the Company's weighted average cost of capital. The Proxy also fails to disclose the inputs and assumptions that went into selecting the next-twelve-months adjusted EBITDAS exit multiple range of 9x-11x.

74.    Barclays performed a second analysis by replacing the terminal values calculated by the next-twelve-months adjusted EBITDAS exit multiples and using a perpetuity growth rate of 3%-5% per year to calculate the new terminal value. *Id.* at 37. Once again, the Proxy does not disclose the inputs and assumptions that went into the selection of 3%-5% perpetuity values for calculating the terminal value.

75.    Since information was omitted, shareholders are unable to discern the veracity of Barclays' *Illustrative Discounted Cash Flow Analysis*.  Without further disclosure, shareholders are unable to compare Barclays' calculations with the Company's financial projections. The absence of any single piece of the above information renders Barclays' *Discounted Cash Flow Analysis* incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

76.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation."

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-3092

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

77.     The failure to provide the above information is all the more concerning because when using the next-twelve-months adjusted EBITDAS multiple for calculating terminal value, the Merger Consideration of $13.25 is just barely above the low end of the range of implied value per share of $13.23-$16.16. Therefore, in order for Aquantia shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

78.     With respect to Barclays' *Comparable Company Analysis (Equity Research Estimates)* and *Precedent Transaction Analysis (Equity Research Estimates)*, the Proxy fails to disclose what the values for the equity research estimates were and identify their sources.

79.     With respect to Barclays' *Equity Research Target Prices Review*, the Proxy fails to disclose the individual price targets and identify their sources.

80.     With respect to Barclays' *Transaction Premium Analysis*, the Proxy fails to identify the 61 global electronics mergers and acquisitions transactions Barclays observed and the premiums in each transaction.

81.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently

- 24 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Aquantia shareholders.

82.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

83.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

### COUNT I
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
17 C.F.R. § 244.100 Promulgated Thereunder)**

84.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

86.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

1   things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation

2   of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other

3   clearly understandable method" of the non-GAAP measure to the "most directly comparable"

4   GAAP measure.  17 C.F.R. § 244.100(a).

5          87.    The failure to reconcile the non-GAAP financial measures included in the Proxy

6   violates Regulation G and constitutes a violation of Section 14(a).

7          88.    As a direct and proximate result of the dissemination of the false and/or misleading

8   Proxy Defendants used to recommend that shareholders approve the Proposed Transaction,

9   Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between

10   the value they will receive as a result of the Proposed Transaction and the true value of their shares

11   prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief

12   as the Court deems appropriate, including rescissory damages.

13   **<u>COUNT II</u>**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and

14   Rule 14a-9 Promulgated Thereunder)**

15          89.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

16   herein.

17          90.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

18   statements that contain "any statement which, at the time and in the light of the circumstances

19   under which it is made, is false or misleading with respect to any material fact, or which omits to

20   state any material fact necessary in order to make the statements therein not false or misleading[.]"

21   17 C.F.R. § 240.14a-9(a).

22          91.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing]

23   public a non-GAAP financial measure that, taken together with the information accompanying that

24   measure . . . contains an untrue statement of a material fact or *omits to state a material fact*

25   *necessary in order to make the presentation of the non-GAAP financial measure . . . not*

26   *misleading*."  17 C.F.R. § 244.100(b) (emphasis added).

27

28

- 26 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**
3:19-cv-3092

92.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

93.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

94.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

95.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

96.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

the Company's financial projections.

97.     Aquantia is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

98.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

99.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

100.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

101.     The Individual Defendants acted as controlling persons of Aquantia within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Aquantia, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

102.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

- 28 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

104.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

105.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

106.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction,

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  unless and until the Company discloses the material information discussed above which has been

2  omitted from the Proxy;

3       C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained

4  as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

5  Transaction;

6       D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

7  attorneys' and expert fees and expenses; and

8       E.      Granting such other and further relief as this Court may deem just and proper.

9                                   **JURY DEMAND**

10      Plaintiff demands a trial by jury on all issues so triable.

11  Dated:  June 4, 2019

12                                              Respectfully submitted,

13                                              **FARUQI & FARUQI, LLP**

14  **OF COUNSEL:**                             By: _/s/ Benjamin Heikali_____
                                                Benjamin Heikali, Bar No. 307466
15  **FARUQI & FARUQI, LLP**                    10866 Wilshire Blvd., Suite 1470
                                                Los Angeles, CA 90024
16  Nadeem Faruqi                               Tel.: (424) 256-2884
    James M. Wilson, Jr.                        Fax: 424.256.2885
17  685 Third Ave., 26th Fl.                    Email: bheikali@faruqilaw.com
    New York, NY 10017
18  Telephone: (212) 983-9330                   *Counsel for Plaintiff Brian Carter*
    Email: nfaruqi@faruqilaw.com
19  Email: jwilson@faruqilaw.com

20  *Counsel for Plaintiff Brian Carter*

21

22

23

24

25

26

27

28
                                    - 30 -
    **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
    THE SECURITIES EXCHANGE ACT OF 1934**

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Brian Carter ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Aquantia Corp. ("Aquantia") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Aquatia securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 2nd day of June, 2019.

_____
Brian Carter

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 10/25/18 | 400 |
|  |  |  |
|  |  |  |